# GOLDEN v CIRCLE T.V. AND APPLIANCE, INC., et al.

## Case No. 82-2875-CA-01

First Judicial Circuit, Escambia County

October 4, 1985

### APPEARANCES OF COUNSEL

**William P. White, Jr.,** Assistant State Attorney, for plaintiff.
**Jeffrey E. Lewis** for defendant.

### OPINION OF THE COURT

NICHOLAS GEEKER, Circuit Judge.

This cause is before the Court upon submission of memoranda by the parties following non-jury trial in which plaintiff seeks to establish that defendant engaged in unfair and deceptive trade practices thereby warranting the grant of declaratory relief, injunctive relief, compensatory damages and the imposition of civil penalties. Defendants deny any wrongdoing and claim the evidence is insufficient to establish a pattern of conduct proscribed by law.

Having heard testimony, having received evidence, having considered

pleadings and pretrial stipulations of the parties, and having judged the demeanor of witnesses testifying and having resolved the credibility choices to be made, this Court enters the following findings of fact and conclusions of law:

## PRELIMINARY STATEMENT OF THE ACTION

This action was instituted by plaintiff as an "enforcing authority" against defendants who are engaged in the business of selling and repairing electronic appliances and products. Based upon numerous complaints received over a period of time from various consumers who had purchased appliances from defendants or had service work performed by them, plaintiff brought this action for declaratory relief and for the recovery of damages and invoked this Court's jurisdiction under the Florida Deceptive and Unfair Trade Practices Act, Section 501.201 *et. seq.*, Florida Statutes (1983). Plaintiff's complaint alleges several acts and practices to be in violation of Florida law: defendants accept items for diagnosis and repair and do repair work prior to receipt of authorization from the customer in violation of Sections 2-28.07(1) and (9), Florida Administrative Code; defendants accept items for repair, represent repairs have been made, and charge for such repair services, when such repairs have in fact not been adequately made, in violation of Sections 2-28.07(2) and (9), Florida Administrative Code; defendants sell electronic equipment and then fail or refuse to honor the warranty for such equipment in violation of Florida law; defendants accept items for repair and diagnosis but refuse to return the item to the customer at no additional charge other than the estimate fee when the customer declines to have the item repaired in violation of Sections 2-28.06(1) and 2-28.07(9), Florida Administrative Code; defendants fail to disclose to customers in a conspicuous manner the right to request a written estimate for labor and parts and the charges therefor in violation of Sections 2-28.02(5) and 2-28.03(6), Florida Administrative Code; defendants fail or refuse to give a written estimate to customers upon request in violation of Section 2-28.02(1), Florida Administrative Code; defendants give verbal estimates for repair services and fail to honor such estimates in violation of Section 2-28.07(9), Florida Administrative Code; defendants fail to return replaced parts on repaired items in violation of Section 2-28.05, Florida Administrative Code; and defendants fail to complete repairs on items returned for further repair without additional charge in violation of Section 2-28.06(2), Florida Administrative Code.

Defendant Bob Prell, the owner of defendant Circle T.V. and Appliance, Inc., has been in the television repair business since 1955

and the owner of the defendant corporation since 1959. In response to plaintiff's complaint, defendants generally deny the wrongdoings alleged and have presented proof that they acted within industry standards and made good faith efforts to repair items to the customers' satisfaction or performed otherwise in accordance to law.

The testimony of the complaining witnesses can be chronicled and capsulated as follows:

## FINDINGS OF FACT

1. Mrs. Phyllis Fowler took her VCR to defendants for repair and received an estimate of $90.00 for the repair work. At first Mrs. Fowler authorized the repair work to proceed but she withdrew her authorization several minutes later because she felt the charges were too high. A representative of defendant attempted to compromise the figure quoted her but Mrs. Fowler indicated her refusal and intention to reclaim her property in the condition she had brought it to defendants. Upon attempting to reclaim the VCR, Mrs. Fowler was informed the VCR had been fully repaired prior to her authorization being received and that she owed defendants $93.00 which had to be paid in cash only before the VCR would be returned to her.

2. Mr. Herbert Parker ordered and prepaid $12.00 for a volume control knob for his television. When the part arrived it was discovered the manufacturer had sent defendants the wrong part. Defendants upon demand by Mr. Parker refused him a refund according to their posted "no refund" policy and told him the prepaid money was used to defray defendants handling costs.

3. Mr. Jim Trent placed his television in repair with defendants. He paid an $18.00 diagnostic fee and received an estimate of $55.00 for repairs. Later he picked up his set and paid his repair bill of $56.63. Within a few days the same problems resurfaced and Mr. Trent returned his set to defendants for further repair. He was advised that the additional repairs would cost between $140 and $150. Mr. Trent declined the repair and was told there would be another $18.00 diagnostic fee charged. After further discussions and negotiations, Mr. Trent agreed to the other repair work for $84.00 but he waited nearly two weeks before the set was repaired. When Mr. Trent retrieved his set, he did not receive all of the old parts that had been replaced and he discovered his UHF reception was disengaged.

4. Mr. Cass Phillips took his television to defendants for repair and paid a diagnostic fee of $17.50. Subsequently, he received a verbal estimate of $56.89 and authorized repairs. Mr. Phillips paid for the

159

repair and took his television home only to discover the same malfunction to be still present. He returned his set to defendants and later was given a verbal estimate of an additional $9.00 for further repairs. When Mr. Phillips' set was repaired defendants, over his objections, charged Mr. Phillips an additional $56.10.

5. Mr. Chaffee Hallmark called defendants for service work on his television at his residence. He was charged $29.50 for this work and paid it on August 18, 1981. Several days later after the set continued to be inoperative it was taken to defendants' premises for further repair. Mr. Hallmark was charged $180.00 for this repair but he was not given an estimate for the repair work contemplated or told of the cost of the repair. Mr. Hall requested that the replaced parts be returned to him but defendants refused to honor his request unless he paid a "due" fee of $62.00.

6. Mrs. Val Lawrence took her television set to defendants to have the picture adjusted and tuned. She was informed of the $25.00 diagnostic fee and left town for several days. When she returned to pick up her set she was told the charges were $103 for the repair work already performed in her absence. Over protest Mrs. Lawrence paid the charges and took the set home only to learn it still had the same problems. She took her set to another establishment and had it repaired for a cost of $8.00.

7. Mr. Dennis Moxley first attempted to get his television serviced and repaired in his home and paid defendants' employee $39.96 for the home visit. He was told that if he requested within five days of this visit defendants would do further repair work at their premises for no additional service charge. When defendants took his set to their premises he requested an estimate be given before any other repair work was done. Several days passed and Mr. Moxley called defendants to learn the status of his set's repair. At that time Mr. Moxley was told the set had been repaired and that he owed $125.00. Mr. Moxley protested he had not authorized the repair and requested the return of his set in "as was" condition. Defendants refused to return his set to Mr. Moxley until he paid a service charge of $59.50. Mr. Moxley relented and paid the full charge but his set continued to malfunction. Subsequently, the set was returned to defendants for further repair which cost him another $10.00.

8. Mr. John Mashman paid defendants a $19.50 diagnostic fee for examination of a radio/intercom system and was later given a verbal estimate of $60.00 for the repair of his system. Mr. Mashman questioned the two charges of $9.90 each for new transistors needed in the

160

repair. Defendant Prell responded the price of the transistors was higher than those to which Mr. Mashman was customary because the price included installation charges. Mr. Mashman indicated to defendants this explanation for contradiction since he was also charged $29.50 for labor.

9. Mr. Beverly Shirley had defendants examine his television at his residence for a picture tube problem. The repairman indicated to Mr. Shirley that it would be necessary to take the set to the shop to complete repairs. Mr. Shirley responded that if the repair cost was going to exceed $100 that the repairman should not take the set. Additionally, Mr. Shirley requested an estimate from defendants prior to repairs being undertaken. Finally, Mr. Shirley was given an estimate of $140 at which time he declined any repairs by defendants. He was then told that to regain possession of his television he would have to pay charges in the amount of $58.00. Confronted with this decision Mr. Shirley permitted defendants to complete the repairs and paid them $149.47.

10. Mrs. Yolanda McArthur took her television set to defendants' place of business for repair and several days later retrieved it and paid defendants $83.48 for the repair work. Within a month of this repair the set malfunctioned again experiencing the same problems it had suffered before. Defendants stated to Mrs. McArthur that she would have to pay for any additional or further repairs to remedy the set's problem.

11. Mrs. Elizabeth Hedenberg ordered from and paid in advance to defendants $36.73 for an Atari cartridge. The item did not arrive in a timely fashion and Mrs. Hedenberg demanded from defendants a refund. After several trips to defendants' business, Mrs. Hedenberg was granted a refund.

12. Mr. Raymond Soto purchased a remote control Zenith television set from defendants in January 1980. Within ninety days the unit began to malfunction and adjustments were performed by defendants' employees to no avail. The set was then taken to defendants' premises for repair and Mr. Soto was charged $225.00. Nevertheless, the set continued to malfunction and periodic attempts by defendants to repair the set were unavailing. Mr. Soto was also charged for these repairs. Finally, Mr. Soto contacted the manufacturer of the product who referred him to another local repairman who successfully repaired Mr. Soto's television.

13. Mrs. Lucille Folck called defendants to repair her console television when she lost her picture. Defendants gave her an estimate of

**161**

$125 and charged her $132.50 for the repairs. Several days after repair the set exhibited the same problems and defendants' representatives told her the set would be repaired at no additional charge because the problem had recurred. She was later called by defendants and informed that her set was ready and there would be an additional charge of $56.00. When Mrs. Folck disputed this additional charge and declined to pay, defendants refused to return her set. Her set was finally returned when her son paid defendants the additional $56.00.

14. In late 1982, Mrs. Deborah Larrabee purchased a television with a remote control device from defendants. Within a few weeks of its purchase, the remote control device began to malfunction. Mrs. Larrabee returned the item to defendants for repair and defendants made several unsuccessful attempts to repair the unit. On one occasion defendants charged Mrs. Larrabee $25.73 for an unsuccessful repair effort. After several requests by Mrs. Larrabee, defendants finally assisted her in contacting the manufacturer of the device and the unit was replaced at no charge.

15. Mr. Russell J. Hebert took a tape recorder and radio to defendants for repair. An attempt was made to repair the tape recorder and Mr. Hebert was charged $30.88. The tape recorder continued to operate improperly and further attempts to correct its problems were unsuccessful. Defendants refused to refund Mr. Hebert his charges or to do other work on this item without additional charges. Defendants also inspected his radio for a fee of $19.30 and could find nothing to repair on it. Subsequently, Mr. Hebert took these items to another repair service and had them properly repaired.

16. Mrs. Eula Madison had her television repaired by defendants and she was charged $117.36. Several days later the television became inoperative and it was repaired by defendants by replacing tubes, some of which had been previously replaced. These subsequent repairs required two separate repair efforts for which Mrs. Madison was charged $9.21 and $24.44 each time. These charges were for new parts or tubes replaced and not for labor costs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of and the parties to this action. Section 501.201, *et. seq.*, Florida Statutes (1983).

2. Plaintiff's witnesses are "consumers" within the statutory definition of the Florida Deceptive and Unfair Trade Practices Act and entitled to invoke that act through the State Attorney for redress of wrongs occasioned by defendants' conduct. Section 501.203(9), Florida Statutes (1983).

3. The collective testimony of the witnesses satisfactorily establishes that defendants engaged in a pattern of deceptive and unfair practices in their trade or business during the time periods alleged in the complaint. *Deltona Corp. v. Jannotti*, 392 So.2d 976 (Fla. 1st DCA 1981).

4. The testimony of Mrs. Hedenberg and Mrs. Madison fails to establish a cognizable violation of Florida law and their individual entitlement to relief.

5. Defendants have failed to comply with the posting requirements of Section 2-28.02(5), Florida Administrative Code.

6. The testimony of Phyllis Fowler establishes violations of Sections 2-28.07(1) and 2-28.06(1), Florida Administrative Code.

7. The testimony of Herbert Parker establishes a violation of Section 2-9.04(1) (2), Florida Administrative Code.

8. The testimony of Jim Trent establishes violations of Sections 2-28.02(2) and (3); 2-28.06(1); 2-28.06(2); 2-28.07(6) and (8), Florida Administrative Code.

9. The testimony of Cass Phillips establishes violations of Sections 2-28.02(4) and (5); 2-28.06(1) and (2), Florida Administrative Code.

10. The testimony of Chaffee Hallmark establishes violations of Sections 2-28.03(6) and 2-28.05, Florida Administrative Code.

11. The testimony of Val Lawrence establishes violations of Sections 2-28.07(1); 2-28.06(1), Florida Administrative Code.

12. The testimony of Dennis Moxley establishes violations of Sections 2-28.02(1); 2-28.06(2); 2-28.07(6) and (8) and 2-28.07(1), Florida Administrative Code.

13. The testimony of John Meshman establishes violations of Sections 2-28.04(7) and (8); 2-28.07(6) and (7), Florida Administrative Code.

14. The testimony of Beverly Shirley establishes violations of Sections 2-28.02(3); 2-28.06(1), Florida Administrative Code.

15. The testimony of Yoland McArthur establishes a violation of Section 2-28.06(2), Florida Administrative Code.

16. The testimony of Raymond Soto establishes violations of Sections 2-28.06(2); 2-28.07(2) and (7) and 2-9.02(5), Florida Administrative Code.

17. The testimony of Lucille Folck establishes a violation of Sections 2-28.06(1) and (2), Florida Administrative Code.

18. The testimony of Deborah Larrabee establishes violations of Sections 2-28.07(2) and (7); 2-28.06(2), Florida Administrative Code.

19. The testimony of Russell Hebert establishes violations of Sections 2028.06(1) and (2); 2-28.07(2) and (7), Florida Administrative Code.

20. Plaintiff is entitled to injunctive relief.

21. Plaintiff is entitled to recover on behalf of the complaining witnesses' compensatory damages to the extent consistent with the foregoing findings of fact and conclusions of law.

22. Plaintiff is entitled to recover the costs of bringing this action.

23. The Court declines to impose a civil penalty in this action.

Accordingly, it is

ORDERED:

1. Plaintiff's motion to amend pleadings to conform with the evidence be and the same is hereby granted.

2. Plaintiff shall prepare a final judgment consistent with this order.